JOSHUA M. FINE (SBN 238071)
Law Offices of Joshua M. Fine
8899 Beverly Blvd., Ste 401
Los Angeles, California 90048
Telephone: (310) 623-4505
Facsimile:  (310) 933-0303
Email: joshua@jmfinelaw.com

Attorney for Plaintiff
ISRAEL BARON

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ISRAEL BARON, an individual,<br><br>     Plaintiff,<br><br>v.<br><br>TETRAGON, LTD, a foreign corporation; XTRMX LTD., a foreign corporation; MEHRDAD ANIFOR, a foreign individual and DOES 1-100, inclusive,<br><br>     Defendants. | Case No.: 2:17-cv-8738<br><br>**COMPLAINT FOR:**<br>**1. BREACH OF ORAL CONTRACT;**<br>**2. BREACH OF IMPLIED CONTRACT;**<br>**3. FRAUD;**<br>**4. NEGLIGENT MISREPRESENTATION; and**<br>**5. INENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS;**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff ISRAEL BARON ("Plaintiff") hereby alleges, by the undersigned attorneys, upon personal information as to itself and upon information and belief as to all other allegations as follows:

## PARTIES/VENUE

1. At all times mentioned herein, Plaintiff was, and now is, an individual residing and doing business in the County of Los Angeles, State of California, in this judicial district.

2. Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned, Defendants TETRAGON, LTD.; XTRMX LTD.; and MEHRDAD ANIFOR (collectively "Defendants"), were and are entities and/or individual residents of the State of Israel and Plaintiff, working on behalf of Defendants, engaged in doing business in the County of Los Angeles, State of California, in this judicial district.

3. Furthermore, the obligations herein and sued upon were made and entered into in the County of Los Angeles, State of California, in this judicial district.

4. Plaintiff does not know the true names and capacities of the Defendants sued herein as Does 1 through 100, inclusive, and therefore sues such Defendants by such fictitious names. Plaintiff will ask leave of the court to amend its complaint when the true names and capacities of such fictitious names of Defendants are ascertained. Plaintiff is informed and believes and thereon alleges that such fictitiously named Defendants are liable to Plaintiff for the facts and circumstances herein alleged.

5. Plaintiff is informed, believes and based thereon alleges, that at all relevant times herein, Defendants, and each of them, were the agent, representative and/or employee of each of the other Defendants, were acting within the course, purpose and scope of their agency, representation and/or employment, and authorized and permitted, consented to and/or ratified the alleged conduct of each of the other Defendants.

## GENERAL FACTUAL ALLEGATIONS

6. On or about February 20, 2017, Plaintiff and XTRMX, Ltd. ("XTRMX") proposed a plan of engagement, whereby Plaintiff was to be retained to represent

XTRMX business development in the U.S.

7. Plaintiff specializes in consulting, advising, business development and sales on behalf of companies looking to break into the technology and entertainment industry located in and around Los Angeles. With over 30 years' experience, Plaintiff's network of contacts in these industries is wide and numerous.

8. In March of 2017, the parties further agreed that Plaintiff will travel to Israel to meet with XTRMX's Board of Directors (the "Board"), who had to provide final approval prior to any engagement. After meeting with the Board during his visit to Israel, Plaintiff was given assurance regarding the financial strength of the company from two (2) Board members, specifically Mehrdad Anifor and Eli Amram, and each stated that "money is not an issue." It was then unanimously confirmed by the Board that Baron will be retained and represent XTRMX in the U.S. with the objective of introducing XTRMX to potential customers, including setting up multiple meetings at the April 22-27, 2017 National Association of Broadcasters ("NAB") show.

9. On or about March 20, 2017, Plaintiff received his first monthly retainer payment in the amount of sixteen thousand and 00/100 dollars ($16,000)("Retainer"). Upon receipt of the payment, Plaintiff sent XTRMX a long form agreement (the "Agreement") memorializing the agreed upon terms by and between Plaintiff and XTRMX. Although he did not receive a signed copy in return, Plaintiff received an email from XTRMX's CEO, Oran Gilad, stating that the Retainer and commission percentages in the agreement were agreed to by XTRMX. At this point, Plaintiff felt comfortable enough in his relationship with XTRMX and its Board, that the formality of executing the Agreement did not prevent him from moving forward with preparations for the fast approaching NAB show. Thus, Plaintiff immediately began reaching out to all his many contacts at major television and movie studios, post-productions houses as well as strategic partners, that could help XTRMX gain major market penetration.

10. The NAB show went extremely well. Plaintiff introduced and had XTRMX present their products to some of the largest brands in the industry including, but not limited to, Amazon, Avid, Adobe, Disney, Sony, Universal, etc. For all intents and purposes, both Plaintiff and XTRMX's employees in attendance were absolutely thrilled with the outcome from the show.

11. Approximately a week thereafter, Plaintiff began making follow up meetings with each of the companies introduced to XTRMX at the NAB show. It was during this time that Plaintiff was shocked to learn that XTRMX's first products, known as xView, was unavailable and not ready to be marketed and sold. Unbeknownst to Plaintiff at the time, he soon discovered that xView was not compatible with over 90% of the industries hardware. As Plaintiff would come to learn, the existing software of xView was only compatible with a PC computer operating system, as opposed to the most commonly used iOS system made by Apple, Inc.

12. It was at this time, that XTRMX's timelines began to shift which created a great amount of uncertainty about the viability of the company. Up until this point, Plaintiff was led to believe that XTRMX had a product ready to go to market and that sales shall commence immediately. However, since this was not the case, Plaintiff was trying to adjust to this new reality and requested a new timeline for xView as well as the other product presented at the NAB show, ediX.

13. Accordingly, after multiple requests, XTRMX came back and provided Plaintiff with a timeline of mid-June 2017 or approximately two (2) additional months for finalizing xView. As for ediX, it was at least three (3) to five (5) months thereafter. Moreover, during this time, the Board accused Plaintiff of not performing his obligations when the real issues had to do with XTRMX's engineers failure to meet time lines and continued delays in product development.

14. Although the odds stacked were against him, Plaintiff was still able to secure XTRMX's very first sale of any kind of its xView product to ColorTime

Pictures, Inc., a well-known post-production house in the entertainment industry.

15. Shortly thereafter, Plaintiff received his third, and what turned out to be his final, retainer payment on May 9, 2017. Since that time, XTRMX has made no further payments as required and previously agreed to by and between the Plaintiff and XTRMX. When Plaintiff inquired as to when he should expect to receive his June payment, Mr. Anifor and Mr. Gilad, both personally assured Plaintiff that his future payments would be honored and pleaded with Plaintiff to continue to work with XTRMX in the interim.

16. As a token of good faith, Plaintiff relied on Mr. Anifor and Mr. Gilad's words and continued to work on behalf of XTRMX. In fact, when Mr. Gilad visited Los Angeles in July 2017, Plaintiff took the initiative to line up meetings with 21st Century Fox, Amazon and Disney Studios.

17. At the direction and request of both Mr. Anifor and Mr. Gilad, Plaintiff has continuously worked for and on behalf of XTRMX. However, since May 9, 2017, through the filing of this complaint, Plaintiff has not received any further Retainer amounts due and owed from XTRMX.

## **FIRST CAUSE OF ACTION FOR BREACH OF ORAL CONTRACT**
### **(Against ALL Defendants and Does 1-100)**

18. Plaintiff realleges and incorporates by reference paragraphs 1 through 17, as though fully set forth herein above.

19. Plaintiff and XTRMX entered into a working relationship whereby Plaintiff agreed to work on behalf of XTRMX to market and sell XTRMX products (Exhibit A).

20. Upon information and belief on or about March 20, 2017, Plaintiff and XTRMX entered into an agreement whereby Plaintiff agreed to sell XTRMX products into the entertainment and media industry.

21. Plaintiff has fully performed all obligations required of Plaintiff under the Contract.

22.  XTRMX has inexcusably breached its obligations under the agreement and continues to breach the agreement by, among other things, failing to provide Plaintiff his monthly retainer fee for services rendered.

23.  As a proximate result of these breaches of contract, Plaintiff has suffered, and will continue to suffer, actual, general and special damages in an amount to be proven at trial but which is in excess of $99,000.00 (Exhibit B). Plaintiff seeks compensation for all damages and losses proximately caused by these breaches.

**SECOND CAUSE OF ACTION FOR BREACH OF IMPLIED CONTRACT**

**(Against ALL Defendants and Does 1-100)**

24.  Plaintiff realleges and incorporates by reference paragraphs 1 through 23, as though fully set forth herein above.

25.  Plaintiff and XTRMX entered into a working relationship whereby Plaintiff agreed to work on behalf of XTRMX to market and sell XTRMX products (Exhibit A).

26.  Upon information and belief on or about March 20, 2017, Plaintiff and XTRMX entered into an agreement whereby Plaintiff agreed to sell XTRMX products into the entertainment and media industry. XTRMX has inexcusably breached its obligations under the agreement and continues to breach the agreement by, among other things, failing to provide Plaintiff his monthly retainer fee for services rendered.

27.  Plaintiff has fully performed all obligations required of Plaintiff under the Contract.

28.  As a proximate result of these breaches of contract, Plaintiff has suffered, and will continue to suffer, actual, general and special damages in an amount to be proven at trial but which is in excess of $99,000.00 (Exhibit B). Plaintiff seeks compensation for all damages and losses proximately caused by these breaches.

# THIRD CAUSE OF ACTION FOR FRAUD

## (Against ALL Defendants and Does 1-100)

29. Plaintiff incorporates by reference paragraphs 1 through 28 of this Complaint, as though fully set forth herein.

30. In or about June 2017, Plaintiff inquired as to why he had yet to receive his payment for June and both Mr. Anifor and Mr. Gilad assured Plaintiff that he would be paid. Previous to this particular discussion, Mr. Anifor informed Plaintiff that "money was not an issue" and that he will fund the company until XTRMX's products go to market.

31. Upon information and belief, Mr. Gilad provided a written response to Plaintiff via email, specifically stated that Plaintiff would be paid and would also receive commissions owed on executed deals. Mr. Gilad also specifically stated in an email dated August 10, 2017, "Following XTRMX board-meeting from 8.8.2017: Based on Israel's mail from 8.3.2017, the board had discussed the manners to manage the activities of the customers delivered by the US team in a fair manner. It was decided that XTRMX shall ex-gratia honor the success-fee commission agreement with Israel Baron, Bob Kisor & Andy Rosen, based on the February 25th email. Israel Baron's 12%; Robert (Bob) Kisor: 7.5% (for the customers delivered by Bob); Andy Rosen: 7.5 % (for the customers delivered by Andy)…" (Exhibit C).

32. Based on representations made by Defendants that Plaintiff should continue to perform services and that payment will be forthcoming, Plaintiff agreed to continue working and performing services for Defendants.

33. The aforesaid representations were material representations upon which Plaintiff relied in agreeing to continue to work with Defendants. The representations induced Plaintiff to continue reaching out to potential clients on behalf of Defendants.

34. Plaintiff is informed and believes, and thereon alleges, that the representations made by Defendants as alleged above, were false, and that Defendants knew the representations were in fact untrue at the time they were made

and/or recklessly made the representations without knowing whether they were true or false, and that Defendants made the representations with the specific intention of concealing the true facts, and/or inducing reliance on the untrue facts, all for the purposes of furthering Defendants' personal financial gain and interests.

35. When Defendants made the representations as hereinabove alleged, it did so with the intention to defraud and deceive Plaintiff with the intent to induce Plaintiff to continue to work and perform services on behalf of Defendants.

36. At the time the above representations were made by Defendants, Plaintiff was unaware of the falsity of Defendants' representations, unaware of the nature and extent and existence of Defendants' concealed facts, unaware of Defendants' true intentions and believed them to be true. In reasonable and justifiable reliance upon those representations, Plaintiff continued and continues to perform services on behalf of Defendants.

37. As a proximate result of the false and fraudulent representations and concealment by Defendants as hereinabove alleged, Plaintiff has been damaged in a sum according to proof at the time of trial but which sum exceeds $99,000.00.

38. Defendants' false and fraudulent representations as hereinabove alleged were made willfully, intentionally, and maliciously and in a conscious disregard of Plaintiff's rights, thus entitling Plaintiff to punitive damages pursuant to California Civil Code § 3294.

**FOURTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION**
**(Against ALL Defendants and Does 1-100)**

39. Plaintiff realleges and incorporates by reference paragraphs 1 through 38 above, as though fully set forth herein.

40. In or about June 2017, Plaintiff inquired as to why he had yet to receive his payment for June and both Mr. Anifor and Mr. Gilad assured Plaintiff that he would be paid. Previous to this particular discussion, Mr. Anifor informed Plaintiff

8
**COMPLAINT**

that "money was not an issue" and that he will fund the company until XTRMX's products go to market.

41. Upon information and belief, Mr. Gilad provided written response to Plaintiff via email, specifically stated that Plaintiff would be paid and would also receive commissions owed on executed deals. Mr. Gilad also specifically stated in an email dated August 10, 2017, "Following XTRMX board-meeting from 8.8.2017: Based on Israel's mail from 8.3.2017, the board had discussed the manners to manage the activities of the customers delivered by the US team in a fair manner. It was decided that XTRMX shall ex-gratia honor the success-fee commission agreement with Israel Baron, Bob Kisor & Andy Rosen, based on the February 25th email. Israel Baron's 12%; Robert (Bob) Kisor: 7.5% (for the customers delivered by Bob); Andy Rosen: 7.5 % (for the customers delivered by Andy)…" (Exhibit C).

42. Based on representations made by Defendants that Plaintiff should continue to perform services and that payment will be forthcoming, Plaintiff agreed to continue working and performing services for Defendants.

43. The aforesaid representations were material representations upon which Plaintiff relied in agreeing to continue to work with Defendants. The representations induced Plaintiff to continue reaching out to potential clients on behalf of Defendants.

44. Plaintiff is informed and believes, and thereon alleges, that the representations made by Defendants as alleged above, were false, and that Defendants recklessly made the representations without knowing whether they were true or false, and that Defendants made the representations with the specific intention of inducing Plaintiff to rely on said representations to continue to provide services to market and sell Defendants' products.

45. At the time the above representations were made by Defendants, Plaintiff was unaware of the falsity of Defendants' representations, unaware of the nature and extent and existence of Defendants' concealed facts, unaware of Defendants' true intentions and believed them to be true. In reasonable and

justifiable reliance upon those representations, Plaintiff continued and continues to perform services on behalf of Defendants.

46. As a proximate result of the false and fraudulent representations and concealment by Defendants as hereinabove alleged, Plaintiff has been damaged in a sum according to proof at the time of trial but which sum in excess of $99,000.00.

## FIFTH CAUSE OF ACTION FOR NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

**(Against ALL Defendants and Does 1-100)**

47. Plaintiff realleges and incorporates by reference paragraphs 1 through 46 above, as though fully set forth herein.

48. Plaintiff has valid business relationships and business expectancies with the companies listed on the Contract (Exhibit A) and acknowledged by Defendants (Exhibit C).

49. Defendants knew or should have known that Plaintiff had these existing customer relationships.

50. Upon information and belief, Defendants are not a party to these previously established business relationships.

51. Defendants have negligently intervened and interfered with Plaintiff's customer relationship, by misrepresenting to Plaintiff that they will continue to work with and through Plaintiff, whenever corresponding with one of Plaintiff's customers which has caused Plaintiff to improperly perform his obligations.

52. Defendants' actions were intentional in that they knowingly made misrepresentations that they knew would result in a breach or disruption of the Plaintiff's relationships.

53. As a result of Defendants' intentional interference with these relationships, Plaintiff has been injured irreparably and otherwise, while Defendants are unjustly enriched.

54. If Defendants are not enjoined, Plaintiff will continue to be injured irreparably and otherwise.

## **PRAYER**

WHEREFORE, Plaintiff prays for judgment as follows:

1. Enter judgment in favor of Plaintiff and against Defendants on all Claims for Relief.

2. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff in excess of $99,000.00 as a result of Defendants' unlawful acts;

3. Order Defendants to pay to Plaintiff punitive and/or treble damages for all claims for relief for which such damages are authorized;

4. Order prejudgment and post judgment interest at the maximum legal rate, as provided by the laws of California, as applicable, as an element of damages which Plaintiff has suffered as a result of the wrongful and illegal acts of Defendants;

5. Order Defendants to pay to Plaintiff restitution and/or repayment for all claims for relief for which restitution is authorized;

6. Order disgorgement of all improper benefits, profits and/or gains; and

7. Order such other relief as the Court deems just and equitable.

Dated: December 4, 2017            **LAW OFFICES OF JOSHUA M. FINE**

By:  /s/ Joshua M. Fine
       Joshua M. Fine, Esq.
       Attorneys for Plaintiff
       Israel Baron

## DEMAND FOR A JURY TRIAL

Plaintiff ISRAEL BARON by and through his attorney, hereby demands, pursuant to Rule 38 of the Federal Rules of Civil Procedure, a trial by jury on all issues triable herein.

Dated: December 4, 2017      **LAW OFFICES OF JOSHUA M. FINE**

By:  /s/ Joshua M. Fine
     Joshua M. Fine, Esq.
     Attorneys for Plaintiff
     Israel Baron

**COMPLAINT**