# Exhibit A

## SERVICES AGREEMENT

This Services Agreement (herein, the "**Agreement**") is made as of this day of June 1, 2017 (herein, the "**Effective Date**"), by and between XTRMX Ltd. a company duly incorporated under the laws of the State of Israel registration No. 515284164 (referred to herein as, the "**Company**") and Israel Baron or Assignee (i.e. IWOR Entertainment, LLC) (referred to herein as, "**ISRAEL**"). Each of the Company and Israel may be referred to herein as a "**Party**" and together the "**Parties**".

| | |
|---|---|
| **WHEREAS** | Company is engaged in the technology industry and created a proprietary media engine (Modus), which is a unique data & media sharing and co-manipulating solution, along with several proprietary products, namely, xView, ediX and xStudio (referred to herein as a "**Product**" and together the "**Products**"). that allows multiple users to review and edit content remotely. xView is a real-time platform that allows multiple users to review and edit content remotely. ediX offers remote editing by streaming the source content from a remote storage to a user workstation on demand. xStudio is a collaborated virtual studio. |
| **WHEREAS** | ISRAEL has experience, information and business connections in the entertainment industry, including but not limited to movie/television and post production in North America (herein, the "**Territory**"); ISRAEL shall have exclusive rights to provide Services in the Territory and non-exclusive rights to provide Services outside the Territory. |
| **WHEREAS** | ISRAEL has introduced to the Company business opportunities from the clients set forth in List of Clients on **Appendix "A"** attached hereto and incorporated into and made part of this Agreement by this reference, as shall be revised from time to time by written agreement of the Parties (herein, the "**List of Clients**"); |
| **WHEREAS** | Each party represents and warrants that it is authorized to enter into and fully perform its respective obligations under this Agreement. |

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained herein, the parties, intending to be legally bound, agree as follows:

1. **Incorporation of Recitals**

    The above recitals are incorporated into and made part of this Agreement by this reference.

2. **Appointment**

    2.1. ISRAEL shall assist the Company to distribute, market and sell the Products in the Territory, on a non-exclusive basis as set forth in this Agreement (herein, the "**Services**"). As of the Effective Date of this Agreement, ISRAEL has introduced the Company to the List of Clients set forth in the List of Clients on **Appendix "A"**.

    2.2. ISRAEL shall participate in the Company's discussions regarding pricing and marketing strategies and assist the Company in negotiating contracts with potential clients listed in Appendix "A".

    2.3. If requested by the Company, ISRAEL may also provide technical services to the clients set forth in the List of Clients on Appendix "A", as shall be agreed to by the Parties in a separate writing (herein the "**Technical Services**").

2.4. The Parties may, by a written agreement between them, amend the List of Clients on **Appendix "A" to include additional clients**, and all of the provisions of this Agreement shall apply to the revised List of Clients.

2.5. ISRAEL will not, without the Company's prior written approval, make any contract or incur any obligation in the name and on behalf of the Company. For avoidance of doubt, it is clarified that the terms and conditions, under which the Company shall enter into any contract, including without limitation with any potential client whose name appears in the List of Clients, shall be determined by the Company at its sole discretion. The Company shall not be obliged to enter into any agreement with regard to any potential client.

2.6. ISRAEL will not be responsible for implementing or fulfilling, Contracts entered into by and between Company and any Client, except that ISRAEL may perform Technical Services as set forth in Section 2.3, as the Parties shall agree between them in advance and in a separate writing.

2.7. The Company will keep ISRAEL updated of all material business correspondence and contacts with potential clients specified in the List of Clients.

2.8. The Company shall not be required to maintain in effect any agreement with any client and may terminate such agreement at any time, at its sole discretion based on the terms therein. ISRAEL shall be entitled to a pro-rata commission determined by the termination date. ISRAEL shall not have any further remedy with regard to such termination.

2.9. ISRAEL shall perform the Services with qualified and experienced personnel, who will be approved in advance and in writing by the Company. Any appointment of new personnel shall be subject to prior written approval by the Company and the Company hereby further agrees to pay for any additional personnel hired by ISRAEL. Removal by ISRAEL of personnel performing Services shall be by a prior written notice to the Company of 5 days, provided that a replaced personnel has been approved prior to removal of any personnel except that in the event that any personnel of ISRAEL terminates his/her engagement with ISRAEL, ISRAEL shall promptly notify the Company of such termination. Any additional outside consultants hired by ISRAEL on the Company's behalf shall be subject to prior written approval by the Company. The Company hereby agrees to pay such outside consultants fees.

3. **ISRAEL's Duties, Obligations and Warranties**

    3.1. ISRAEL represents and warrants that it has the legal power, authority and right to enter into this Agreement and to perform all of its obligations set forth in this Agreement.

    3.2. ISRAEL represents and warrants that he is not prevented by any other contract, under law or under a court's or any authority's order, from entering into this Agreement of performance hereof.

    3.3. ISRAEL warrants and represents that no employment or agency relationship shall exist between the Company and ISRAEL or any one on ISRAEL's behalf.

    3.4. ISRAEL will comply with all reasonable directions and instructions given to him by the Company in relation to this Agreement.

    3.5. ISRAEL is prohibited from using or registering any trademark, trade name, product, patent or other right used by the Company or by any of its Affiliates.

    3.6. ISRAEL will report to the Company on a weekly basis or more if so requested regarding the Services performed by him in accordance herewith and the time of such work.

3.7. ISRAEL undertakes that the following portion of the Services shall be performed by Israel Baron based off a budget supplied by Company: proposing a strategic marketing plan for North America; preparing and delivering a quarterly marketing and sales forecast; finding and presenting to the Company, the market needs and trends; monthly detailed reports of the actual Services performed during the lapsed month.

3.8. During a twenty-four (24) month period from expiration or termination of this Agreement for any reason, ISRAEL, directly or indirectly, shall not engage in any business competing with the business of the Company, shall not engage with any client, potential client or supplier of the Company for any business.

3.9. ISRAEL shall not, directly or indirectly, engage with any employee or agent of the Company for any purpose, during the Term of this Agreement and twelve (12) months from its expiration or termination for any reason.

4. **Compensation**

4.1. In consideration for the performance of the Services, ISRAEL shall be entitled, during the Term of this Agreement to a monthly retainer as set forth in **Appendix "B"** attached hereto and incorporated into and made part of this Agreement by this reference (herein, the "**Retainer**").

4.2. In addition to the Retainer for the performance of the Services, ISRAEL shall be entitled to commissions with respect to all Qualifying Contracts at the rates set forth in **Appendix "B"** from all Net Revenues received by the Company during the Term and twenty-four (24) months from expiration or termination thereof other than termination due to breach by ISRAEL of this Agreement (herein, the "**Commission**").

The term "**Qualifying Contract**" means a binding contract, which the Company or any of its Affiliates shall enter into with a Client included in the List of Clients, during the Term of this Agreement or twelve (12) months from the expiration of the Term or termination of this Agreement other than for breach by ISRAEL.

The term "**Affiliate**" used herein means a legal entity, which controls a Party, under common control with a Party or controlled by a Party. The term "control" used herein means holding of the majority of the share capital or interests of another legal entity.

The term "**Net Revenues**" means the total amounts of all revenues that the Company actually receives under all Qualifying Contracts less discounts, returns, refunds, credits issued to customers in lieu of refunds, bad debts and associated costs (including, without limitation, attorney and collectors' fees).

4.3. In addition to the Commissions ISRAEL receives for the performance of the Services, ISRAEL's sales agents and/or associates, shall be entitled to commissions with respect to all Qualifying Contracts at the rates set forth in **Appendix "B"** from all Net Revenues received by the Company during the Term and twenty-four (24) months from expiration or termination thereof other than termination due to breach by ISRAEL of this Agreement (herein, the "**Sales Group Commission**").

4.4. ISRAEL shall not be entitled to reimbursement of any expenses unless otherwise agreed to in advance and in writing by the Parties. All expenses approved by the Company shall be paid within thirty (30) days of ISRAEL submitting an expense report to the Company.



4.5. The Commissions shall be paid on a monthly basis, on the 10th day of each month for the preceding month's commissions. All Net Revenues received by the Company prior to the 28th day of each month, shall be included in the monthly commissions. Any Net Revenues received after the 28th day of the month, shall be included in the following month's commissions.

4.6. In the event that a Client included in the List of Clients makes any investment in the Company, including but not limited to, cash contribution, stock for stock, or purchase of an equity interest of the Company, ISRAEL shall be entitled to an amount equal to seven and one-half percent (7.5%) of the gross consideration ( received by the Company (herein, the "**Investment Commission**").

4.7. The Retainer, Commission, **Sales Group Commission** and Investment Commission, shall be the sole and exclusive remuneration ISRAEL shall be entitled to receive for the fulfillment of its obligations under this Agreement.

4.8. All taxes resulting from payment hereunder shall be borne by ISRAEL. The Company shall deduct any amount it must deduct under applicable law.

5. **Confidentiality**

    5.1. All the Company's technology, know-how, software, source code, documents, reports, drawings, designs and technical information and specifications, pricing, trade secrets, and all rights and interest thereto, including patents, copyright, trademarks, service marks, trade names, list of the Company's customers and any other intellectual property rights the Company is or may be entitled to (the "**Confidential Information**"), belong solely to the Company. ISRAEL hereby acknowledges that nothing in this Agreement shall be deemed as granting or transferring in any way any such rights in the Confidential Information or any part thereof.

    5.2. ISRAEL acknowledges that the Confidential Information is a valuable, special, and unique asset of the Company's business.

    5.3. ISRAEL will not: (1) during the term of this Agreement, and thereafter for a period of five (5) years, disclose the Confidential Information to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever, except for any disclosure required by law, any court order or subpoena or by order of any other governmental authority, provided that prior notice is given to the Company as soon as possible before any such disclosure is made; (ii) use the Confidential Information after termination or expiration of this Agreement.

    5.4. ISRAEL undertakes and agrees that upon termination of this Agreement, it shall return to the Company all of the Confidential Information, which may be in its possession or under its control.

    5.5. ISRAEL undertakes to cause all of its employees to bind themselves to the same pledge or confidentiality to the Company as contained in this Section 5.

6. **Term**

    6.1. The initial term of this Agreement will commence upon the Effective Date and continue through May 31, 2018, unless earlier terminated in accordance with the termination provisions hereof (the "**Initial Term**"). This Agreement shall be automatically extended after the Initial Term for successive consecutive terms of one (1) year (a "**Renewal Term**"), unless either party delivers to the other Party, at any time, an advance written notice of termination of ninety (90) days. Notwithstanding the foregoing, Company may only terminate this Agreement due to a breach by ISRAEL which has not been cured within thirty (30) days after receipt of written notice from Company. The Initial Term and any Renewal Terms are sometimes collectively referred to herein as the "Term".

6.2. In the event of expiration of the Term or an earlier termination, which is not due to ISRAEL's breach of this Agreement, ISRAEL shall be entitled to the Commissions for Qualifying Contracts as set forth in Section 4.1 and 4.3.

7. **Tradeshows, Conventions & Festivals**

   7.1. The Company acknowledges that as part of the Services to performed by ISRAEL under this Agreement, Israel Baron's attendance at industry related tradeshows, conventions and/or technology festivals such as NAB and IBC (collectively referred to herein as "Tradeshows"), is mandatory. As such, the Company agrees to pay for all expenses related to Israel Baron's attendance to Tradeshows including, but not limited to, airfare (business-class for international flights), hotel accommodations, entrance fees and a per diem.

8. **Nature of Relationship**

   The Parties hereto are independent contractors and nothing contained in this Agreement shall be deemed or construed to create the relationship of employment, partnership or joint venture or principal and agent or of any association or relationship between the Company and ISRAEL. ISRAEL acknowledges that it does not have, and shall not make any representation to any third party either directly or indirectly indicating ISRAEL has, in any way, authority to act for or on behalf of the Company or to obligate the Company in any way whatsoever. Each Party is responsible for all taxes, duties and other government assessments incurred as a result of such Party's performance under this Agreement.

9. **Compliance and Indemnity**

   9.1. In performing this Agreement, ISRAEL shall comply with all applicable laws, rules, and regulations of the territories in which ISRAEL performs its activities, including without limitations any labor laws in the United States of America, and shall indemnify and hold harmless the Company in the event of claim against the Company as a result of infringement of any applicable law by ISRAEL.

   9.2. The Company shall have no liability to ISRAEL with respect to claims arising out of, in connection with, or resulting from this Agreement or the performance thereof, whether in contract, tort or otherwise, except for the payment of the remunerations explicitly set forth in this Agreement.

   9.3. If, despite the representations in this Agreement it shall, at any time, be determined by a court of competent jurisdiction or any government authority that employment or agency relationship exists between the Parties or any one on behalf of ISRAEL, and as a result of such decision ISRAEL or such third party or any authority shall become entitled to any rights and/or payments resulting from the existence of such relations, ISRAEL undertakes to indemnify the Company upon its first demand, for all losses, payments, expenses (including legal fees and expenses) and damages incurred by the Company as a result of such decision.

10. **Compliance with FCPA**

    Without limiting the foregoing, each Party agrees to act in accordance with the U.S.A Foreign Corrupt Practice Act ("FCPA"), irrespective of any other governing law:

    10.1. The Parties and/or their respective representatives shall not make any offer, payment, or promise to pay or offer, of anything of value to any government officials (national, regional, municipal, foreign or local) or political party officials to obtain or retain business or to secure an improper business advantage. The prohibition extends to offers, payments, or promises to pay or offer any ISRAEL or family member of any government officials to induce or obtain or retain business.

10.2. **"Government Officials"** include officers, employees or other persons employed by or acting in an official capacity for a government at the national, regional, municipal, foreign or local level, any such government department, agency or instrumentality, any public international organization (such as the United Nations, the European Bank for Reconstruction and Development, the World Bank and the International Monetary Fund, the International Committee of the Red Cross and the International Red Crescent Society, and other public international and multilateral organizations). Such "covered" government officials also include persons employed by utilities, companies, entities or organizations that are owned in whole or in part or otherwise controlled by a government agency.

10.3. The Parties and/or their respective representatives shall maintain accurate books and records and shall establish and maintain internal control to account for all assets and expenditures made in conduct of its business, to prevent creation or use of unrecorded or other sources of funds from which payments contrary to the FCPA might otherwise be made.

10.4. Each of the Parties certifies and undertakes that it and/or its representatives did not engage in, nor will they in the future engage in, any conduct that violates the FCPA, or the equivalent or comparable anti-corruption law of any country either in connection with any services or assistance that it has or will provide to or on behalf of any Party or any third party.

10.5. Each of the Parties certifies that it is and/or its representatives are not aware of any conduct contrary to the FCPA or the equivalent or comparable anti-bribery law of any other country in connection with the provision of this Agreement and with any services that may be provided to any Party, on behalf of any Party, or to any other party by such Party.

10.6. Further, each Party certifies, acknowledges and agrees that if it and/or its representatives become aware of an anticipated or actual violation of the FCPA by any person or entity in connection with this Agreement and/or with any services that may be provided to any Party or on behalf of any Party, it is required to report such information to the other Parties within twenty-four (24) hours.

10.7. Each of the Parties certifies that if, at any time as of the Effective Date, there is a change in circumstances such that the undertaking and/or confirmations a Party made above are no longer accurate, true or correct, each Party undertakes to report and make a disclosure of such change to the other Parties within twenty-four (24) hours.

10.8. Each Party understands, acknowledges and agrees that its failure to comply with any of the provisions in this Section 7 shall constitute a material breach of the terms of this Agreement and any other agreement with any of the Parties, and shall be cause for immediate suspension or termination thereof at the other Parties' sole discretion.

11. **Miscellaneous**

    11.1. Omission or delay on the part of any party in requiring due and punctual fulfillment of any of the obligations of the other part hereunder shall not be deemed a waiver of such obligation, or any other obligations, present or future, or of any resulting remedy for the breach thereof. Any waiver on the part of a Party must be in writing and shall be effective only to the extent specifically set forth in such writing.

    11.2. Notices or other communications given under this Agreement must be in writing, and may be given via email or overnight delivery, to the Parties' registered office address as written above. Such notices shall be deemed effective upon delivery. Notwithstanding the foregoing, any notice sent to the last designated address of a Party under this Agreement will not be deemed ineffective if actual delivery cannot be made due to a change of address of the Party or the failure or refusal of such Party to accept delivery of the notice.

11.3. This Agreement may not be assigned by ISRAEL to any third party without the prior written consent of the Company, at the Company's sole and absolute discretion, and any unauthorized assignment shall be deemed null and void.

11.4. If any provision in the Agreement is held to be illegal, invalid or unenforceable, in whole or in part, the provision shall apply with whatever deletion or modification is necessary so that the provision is legal, valid and enforceable and gives effect to the economic, legal and commercial intentions of the parties hereto. To the extent it is not possible to delete or modify the provision, in whole or in part, under this Clause, then such provision or part of it shall, to the extent that it is illegal, invalid or unenforceable, be deemed not to form part of this Agreement and the legality, validity and enforceability of the remainder of this Agreement shall, subject to any deletion or modification made under this Clause, not be affected.

11.5. This Agreement will be governed by, and construed in accordance with the laws of the State of California applicable to contracts entered into and performed entirely within such State. In the event that either party to this Agreement is compelled to bring a claim to enforce the provisions of this Agreement, or to recover damages as a result of a breach of this Agreement, or from any other cause arising from this Agreement, such claim shall first be submitted to non-binding mediation, which shall be conducted in accordance with the mediation dispute resolution procedures of the American Arbitration Association ("AAA"). If the mediation does not result in a settlement of the claim, the aggrieved party shall proceed to arbitration. The arbitration shall be binding, and shall be conducted in accordance with the then-current arbitration rules of the AAA before a single arbitrator. BY SIGNING THIS AGREEMENT, THE PARTIES AGREE THAT ALL DISPUTES WILL BE DECIDED BY ARBITRATION AND EACH PARTY WAIVES THE RIGHT TO A JURY TRIAL OR COURT TRIAL. No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by both Parties.

11.6. This Agreement may be signed by one or more counterparts, each of which shall be deemed a valid and enforceable contract.

11.7. This Agreement may not be modified or amended in any respect, except by a written agreement signed by both Parties. This Agreement constitutes an integration of the entire understanding and agreement of the Parties, and any representation, premise or condition not specifically incorporated in this Agreement, will not be binding upon either party.

11.8. ISRAEL HEREBY REPRESENTS THAT IT HAD REASONABLE TIME TO CONSULT WITH LEGAL COUNSEL OR ANY OTHER COUNSEL WITH RESPECT TO THIS AGREEMENT, IT UNDERSTANDS THIS AGREEMENT TO THE FULLEST AND ENTERS INTO THIS AGREEMENT OUT OF ITS FREE WILL.

IN WITNESS WHEREOF, the parties hereto have affixed and caused to be affixed their respective signatures this _9_ day of July 2017.

**COMPANY:**
XTMX, Ltd.

By: _____
Its: _____

**ISRAEL:**
Israel Baron

_____
Israel Baron, an individual

## APPENDIX "A"- LIST OF CLIENTS

The clients listed below shall also include any parent and/or subsidiary(ies) of these entities. The initial List of Clients below may be amended from time to time in writing by the Parties.

- Avid
- Viacom
- Fox Studio
- Brightcov
- Walt Disney Studios (Marvel)
- CineCert
- Paramount
- Warner Bros.
- Microsoft Production Studios.
- Amazon Studios
- Nutmeg Creative
- Color Time
- Netflix Corp
- Sohonet
- Google
- Adobe
- Silverline Three Sixty Group
- Dreamworks
- Sony Pictures
- Universal (Comcast)
- Walt Disney Studios (ABC)
- Azteca America
- NETFLIX Production
- Lionsgate
- Open Road Films
- SABAN Entertainment /BVS Entertainment Inc
- RED BULL MEDIA HOUSE
- ONE Media, LLC
- ESL
- Blizzard
- Freemantle Media
- STX Entertainment
- CBS
- NBC (Comcast)
- Hallmark
- Fotokem
- UFA
- Deluxe
- Efilm/Deluxe
- Codex
- Pearl Consortium
- COX

Verance
DOLBY LABORATORIES, INC.
LYTRO
Fox News
DTS
The Turner Broadcasting System
Sinclair Broadcast Group/ Sinclair Digital
WPP/Kantar Media
Ericsson
Verizon
Vision Media
Vimeo
Nokia
Point.360
Rainmaker Entertainment
EMA
Screaming Image Technology Inc.
VR Cinematics
Lytro
The Foundry Visionmongers
Twich
Arri
IRT
Real Networks
Cast Labs
GIC
Marquise Technologies
EBU/BBC
(HRS) Hollywood Riviera Studios

Other Departments
Sony
Walt Disney Imagineering
Warner Bros. Entertainment
Apple
Microsoft
The X Studio
New Wave Group
MovieLabs
Motion Picture Eye-Fidelity
CableLabs
cisco
Dolby Laboratories, Inc.
IMAX Corporation
Technicolor



Texas Instruments
Third Dimension Technologies
OTOY, Inc.
Sony Electronics
Starbreeze / IMAX VR
TIPD, LLC
YouTube
Alibaba – US
TCL
Azteca MEX
Tycoon
Pepsi Licensing Promotion
Red box
XLG



## APPENDIX "B"

## MONTHLY RETAINER AND RATES OF COMMISSIONS

First 3 month agreed and discounted starting March 1, 2017 to end of May 30, 2017

| ISRAEL's Retainer | $10,000 | Retainer Fee per month paid to ISRAEL |
| --- | --- | --- |
| ISRAEL's Commission | 12.00% | ISRAEL Commission Fee from the Net Revenue (as defined in the Agreement) |
| ISRAEL's Sales Group Commission* | 7.50% | Individual sales persons managed by ISRAEL who shall receive a Commission Fee from the Net Revenue (as defined in the Agreement) |

*ISRAEL shall receive the total 19.5% Commission Fees and shall be responsible to make payments to the individual sales persons.

| | | | Total by Month | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Month | Retainer | Bob/Andy | Omer/William | Roy/Tech | Travel | Total Per Month |
| Mar-17 | $10,000 | $3,500 | $2,750 | $750 | $6,500 | $23,500 Paid |
| Apr-17 | $10,000 | $3,500 | $2,750 | $750 | - | $17,000 Paid |
| May-17 | $10,000 | $3,500 | $2,750 | $750 | - | $17,000 Paid |

Continue Jun 1, 2017

| ISRAEL's Retainer | $12,500 | Retainer Fee per month paid to ISRAEL BARON |
| --- | --- | --- |
| ISRAEL's Commission | 12.00% | ISRAEL Commission Fee from the Net Revenue (as defined in the Agreement) |
| ISRAEL's Sales Group Commission* | 7.50% | Individual sales persons managed by ISRAEL who shall receive a Commission Fee from the Net Revenue (as defined in the Agreement) |

*ISRAEL shall receive the total 19.5% Commission Fees and shall be responsible to make payments to the individual sales persons.

| Month | Retainer | Bob/Andy | Omer/William | Roy/Tech | Travel | Total Per Month |
| --- | --- | --- | --- | --- | --- | --- |
| Jun-17 to May-18 | $ 12,500 | Case by case basis (if needed) (see Section 2.9) | $2,750 | $750 | TBD | $16,000 |
| | | | | + Any Additional work (see Section 2.3) | | |

*June 2017 invoiced and paid as Agreed by the Agreement



# Exhibit B

# Statement

ISRAEL BARON
11480 DONA DOROTEA DR.
STUDIO CITY CA 91604

| Date |
|---|
| 12/1/2017 |

**To:**
XTRMX LLC
9 Omarim St.
8496500 Omer, Israel

| Amount Due | Amount Enc. |
|---|---|
| $99,899.59 | |

| Date | Transaction | Amount | Balance |
|---|---|---:|---:|
| 12/31/2016 | Balance forward | | 0.00 |
| 02/27/2017 | INV #030117. Due 02/27/2017. | 15,000.00 | 15,000.00 |
| 03/05/2017 | INV #030517. Due 03/05/2017. | 3,500.00 | 18,500.00 |
| 03/07/2017 | PMT #Wire. APOALIM B M TEL-AVIV ISRAEL ORG: | -14,982.00 | 3,518.00 |
| 03/07/2017 | Discount #Wire. APOALIM B M TEL-AVIV ISRAEL ORG: | -18.00 | 3,500.00 |
| 03/21/2017 | PMT #Andy Bob NAB. | -3,470.00 | 30.00 |
| 03/21/2017 | Discount #Andy Bob NAB. | -30.00 | 0.00 |
| 04/01/2017 | INV #040117. Due 04/01/2017. | 17,000.00 | 17,000.00 |
| 04/04/2017 | PMT | -16,970.00 | 30.00 |
| 04/04/2017 | Discount | -30.00 | 0.00 |
| 05/01/2017 | INV #050117. Due 05/01/2017. | 17,000.00 | 17,000.00 |
| 05/08/2017 | INV #050118. Due 05/08/2017. | 1,112.78 | 18,112.78 |
| 05/12/2017 | PMT | -16,970.00 | 1,142.78 |
| 05/12/2017 | Discount | -30.00 | 1,112.78 |
| 06/01/2017 | INV #060117. Due 06/01/2017. | 16,000.00 | 17,112.78 |
| 06/22/2017 | PMT #Wire Transfer. | -16,970.00 | 142.78 |
| 06/22/2017 | Discount #Wire Transfer. | -142.78 | 0.00 |
| 07/01/2017 | INV #070117. Due 07/01/2017. | 16,000.00 | 16,000.00 |
| 08/01/2017 | INV #080117. Due 08/01/2017. | 16,000.00 | 32,000.00 |
| 08/03/2017 | INV #080317. Due 08/03/2017. | 240.00 | 32,240.00 |
| 09/01/2017 | INV #090117. Due 09/01/2017. | 16,120.00 | 48,360.00 |
| 09/30/2017 | INV #FC093017. Due 10/10/2017. Finance Charge | 1,198.31 | 49,558.31 |
| 10/01/2017 | INV #100117. Due 10/01/2017. | 16,120.00 | 65,678.31 |
| 11/01/2017 | INV #110117. Due 11/01/2017. | 16,120.00 | 81,798.31 |
| 11/01/2017 | INV #FC 6. Due 11/01/2017. Finance Charge | 1,009.60 | 82,807.91 |
| 12/01/2017 | INV #120117. Due 12/01/2017. | 16,120.00 | 98,927.91 |
| 12/01/2017 | INV #FC 9. Due 12/01/2017. Finance Charge | 971.68 | 99,899.59 |

| CURRENT | 1-30 DAYS PAST DUE | 31-60 DAYS PAST DUE | 61-90 DAYS PAST DUE | OVER 90 DAYS PAST DUE | Amount Due |
|---:|---:|---:|---:|---:|---:|
| 17,091.68 | 17,129.60 | 1,198.31 | 16,120.00 | 48,360.00 | $99,899.59 |

# Exhibit C

**Oran CEO - XTRMX board-meeting from 8.8.2017 emailed to Bob Andy and Israel**

**From:** Oran Gilad [mailto:oran.gilad@xtrmx.com]
**Sent:** Thursday, August 10, 2017 1:16 PM
**To:** Israel Baron <ibaron@senitype.com>
**Subject:** XTRMX board meeting from 8.8.2017


Following XTRMX board-meeting from 8.8.2017:

Based on Israel's mail from 8.3.2017, the board had discussed the manners to manage the activities of the customers delivered by the US team in a fair manner.

It was decided that XTRMX shall ex-gratia honor the success-fee commission agreement with Israel Baron, Bob Kisor & Andy Rosen, based on the February 25th email:


Israel Baron's 12%
Robert (Bob) Kisor: 7.5% (for the customers delivered by Bob)
Andy Rosen: 7.5% (for the customers delivered by Andy)


The above holds for sales of XTRMX xView to the companies stated below, and valid for two years from the sale's date.

May all parties will face success with whatever they do.


List of companies where this agreement holds:

Avid
Adobe
CineCert
ColorTime
Sohonet
20th Centruy Fox
Disney
Amazon Studios
Universal
Viacom
Paramount
Warner Bros
Sony Pictures
EFilm/Deluxe

Lufthansa Systems
Studio 100 Animations
Omelet
Azteca America
RealNetworks
EVS
Nutmeg
CBS
Fotokem
Netflix
Microsoft Production Studios
Brightcove
DVS
Comcast Cable
STARZ Premium

------------------------------------------------------------------------------------

[redacted]
[redacted]
[redacted]
[redacted]
[redacted]


[redacted]


[redacted]
[redacted]


[redacted]
[redacted]



[redacted]
[redacted]
[redacted]



[redacted]
[redacted]


[redacted]